## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

ANGELA ROY                                                              MOVANT

v.                                                        No. 3:16CR110-MPM-RP

UNITED STATES OF AMERICA                                            RESPONDENT

### MEMORANDUM OPINION

This matter comes before the court on the motion of Angela Roy to vacate, set aside, or correct her sentence under 28 U.S.C. § 2255. The government has responded to the motion; Ms. Roy has not replied, and the deadline to do so has expired. The matter is ripe for resolution. For the reasons set forth below, the instant motion to vacate, set aside, or correct sentence will be denied.

### *Habeas Corpus* Relief Under 28 U.S.C. § 2255

The writ of *habeas corpus*, a challenge to the legal authority under which a person may be detained, is ancient. Duker, The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame, 53 N.Y.U.L.Rev. 983 (1978); Glass, Historical Aspects of Habeas Corpus, 9 St. John's L.Rev. 55 (1934). It is "perhaps the most important writ known to the constitutional law of England," *Secretary of State for Home Affairs v. O'Brien*, A.C. 603, 609 (1923), and it is equally significant in the United States. Article I, § 9, of the Constitution ensures that the right of the writ of *habeas corpus* shall not be suspended, except when, in the case of rebellion or invasion, public safety may require it. *Habeas Corpus*, 20 Fed. Prac. & Proc. Deskbook § 56. Its use by the federal courts was authorized in Section 14 of the Judiciary Act of 1789. *Habeas corpus* principles developed over time in both English and American common law have since been codified:

The statutory provisions on *habeas corpus* appear as sections 2241 to 2255 of the

1948 Judicial Code. The recodification of that year set out important procedural limitations and additional procedural changes were added in 1966. The scope of the writ, insofar as the statutory language is concerned, remained essentially the same, however, until 1996, when Congress enacted the Antiterrorism and Effective Death Penalty Act, placing severe restrictions on the issuance of the writ for state prisoners and setting out special, new *habeas corpus* procedures for capital cases. The changes made by the 1996 legislation are the end product of decades of debate about *habeas corpus*.

*Id*.

## Section 2255 Proceedings

Section 28 U.S.C. § 2255 permits an inmate serving a sentence after conviction of a federal crime "to move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). As with the writ of *habeas corpus*, *see* 28 U.S.C. §§ 2241, 2254, § 2255 sets forth only four bases on which such a motion may be made: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Thus, a prisoner must claim either a constitutional violation or want of subject matter jurisdiction to invoke 28 U.S.C. § 2255. In the absence of constitutional or jurisdictional defects, a federal prisoner may invoke § 2255 only if the error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185 (1979).

The district court must first conduct a preliminary review of a section 2255 motion, and "[i]f it plainly appears from the motion, any attached exhibits, and the record of the prior proceeding that the moving party is not entitled to relief, the judge must dismiss the motion." Rules Governing Section 2255 Proceedings, Rule 4(b). If the motion raises a non-frivolous claim to relief, the court must order the Government to file a response or to take other appropriate action. *Id.* The judge may then require

the parties to expand the record as necessary and, if good cause is shown, authorize limited discovery. *Rules Governing Section 2255 Proceedings,* Rules 6–7.

After reviewing the government's answer, any transcripts and records of prior proceedings, and any supplementary materials submitted by the parties, the court must decide whether an evidentiary hearing is warranted. *Rules Governing Section 2255 Proceedings,* Rule 8. Under the statute, an evidentiary hearing must be held unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). However, the court need not hold an evidentiary hearing if the prisoner fails to produce "independent indicia of the likely merit of [his] allegations." *United States v. Edwards,* 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes,* 132 F.3d 1106, 1110 (5th Cir. 1998)).

Ultimately, the petitioner bears the burden of establishing her claims of error by a preponderance of the evidence. *See Wright v. United States,* 624 F.2d 557, 558 (5th Cir. 1980). For certain "structural" errors, relief follows automatically once the error is proved. *See Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir. 2003). For other errors at the trial court level, the court may grant relief only if the error "had substantial and injurious effect or influence" in determining the outcome of the case. *Brecht v. Abrahmson,* 507 U.S. 619, 637 (1993); *see also United States v. Chavez,* 193 F.3d 375, 379 (5th Cir. 1999) (applying *Brecht's* harmless error standard in a § 2255 proceeding). If the court finds that the prisoner is entitled to relief, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence [her] or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

### Facts and Procedural Posture[1]

Angela Roy planned and executed an armed robbery of the Randolph, Mississippi postmaster, as described in detail below. The morning of September 23, 2016, at 10:28 am, a woman called the U.S. Post office in Randolph, Mississippi and asked when the post office would open. Record on Appeal ("ROA").307. The Postmaster told her that the post office would open at 10:30 am. ROA.307. Shortly thereafter, Richard Thomas Scott entered the post office and asked the Postmaster about renting a post office box. ROA.308. When the Postmaster turned to show Scott the various box sizes, he shot at her three times with a handgun, hitting her one time in the left forearm. ROA.311-12.

Scott testified that he and Angela Roy committed the armed robbery – and that it was Roy's idea. ROA.396. The plan was to steal money and money orders. ROA.397. Scott and Roy obtained the handgun from a car they previously burglarized. ROA.399. They planned to leave "no witnesses," by killing any witnesses. ROA.399. Scott testified it was Roy who had called the post office a few minutes before the robbery. ROA.400.

Scott said Roy remained outside as he entered the post office to rob it and shot the Postmaster. ROA.400-01. When shot, the Postmaster hit the floor and sought refuge behind a small wall in the post office while Scott jumped the counter and entered the working area of the post office. ROA.313. The Postmaster fled out a side door toward a neighbor's house. ROA.315.

As the Postmaster fled, she looked back into the post office parking lot and saw a woman

---

[1] The court has drawn the facts and procedural posture of this case from the Government's Response [157] to the instant § 2255 motion, as they are both well-documented and uncontested.

wearing a yellow bandana over her face standing next to a gold Pontiac G6.  ROA.314.  Scott

took the Postmaster's purse and keys and fled with Roy.  ROA.319-20.  They drove away from

the post office but went the wrong way and had to turn around, driving back by the post office.

ROA.315; ROA.401.

    As they passed the post office and neighbor's house, Roy urged Scott to shoot the

Postmaster who was then standing at the neighbor's door, but the weapon had jammed in the

post office, so he did not.  ROA.401.  The Postmaster was knocking on the neighbor's door, but

the neighbor did not let her enter.  ROA.315. The Postmaster observed the gold Pontiac G6 drive

past. ROA.315-16.  After the car drove by, the Postmaster ran to a convenience store located at

the corner of the post office road and a nearby highway.  ROA.316.  There the local sheriff's

office was contacted, as well as the Mississippi Highway Patrol and U.S. Postal Inspectors.

ROA.335; ROA.359; ROA.452.

    After the armed robbery, Scott and Roy fled to south Alabama.  ROA.406.  They soon

learned the "Feds" were looking for them.  On September 27, 2016, they drove past a local

police station and saw Roy's father's vehicle there.  ROA.406.  Upon seeing this, they collected

Roy's daughter and fled to Louisiana on the way to Texas.  ROA.407.

    Roy attempted to create an alibi for herself through the testimony of her daughter.  Her

daughter testified that Roy and Scott took her to Lashay Owen's house in Mobile, Alabama on

September 21, 2016, and left her there on September 22.  ROA.622.  She received a telephone

call from Roy late that evening.  ROA.623.  Then she went to sleep, and Roy and Scott arrived at

Owen's house the next morning.  ROA.627.  When Roy's daughter woke up around 9 am, Roy

was there, but Scott was gone.  ROA.629.  According to Roy's daughter, later that day, sometime

between 5:30 and 7:00, Scott returned.  ROA.631.

- 5 -

Anticipating Roy's alibi defense, the government had Lashay Owens testify during its case-in-chief. She testified that Roy brought Scott to her home sometime in September. ROA.562-63. Roy then brought her daughter to Owens' house. ROA.563. Roy and Scott left, leaving Roy's daughter with Owens. ROA.563. Owens testified that Roy and Scott returned after they were gone for approximately 24 to 36 hours. ROA.564. Owens testified that Scott never left her house without Roy, and Roy was never at her house without Scott. ROA.564. Owens testified that when Roy and Scott returned, the pair had a handgun and further it smelled like it had been recently fired. ROA.565-66.

Granite Telecommunication in Quincy, Massachusetts provides telephone services to post offices, including the Randolph, Mississippi post office. The telephone number of the call made to the Randolph post office on September 23, 2016, was identified and sent to postal inspectors that day. ROA.376-78. After Roy was identified as an associate of Scott and investigators determined she owned a Pontiac G-6, a Deputy U. S. Marshal entered Roy's car tag into the Mississippi, Alabama, and Louisiana tag reader systems to be alerted if it was logged crossing state lines. ROA.384.

Postal Inspectors and officers in Louisiana were alerted when the Pontiac G-6 bearing Roy's tag number crossed into Louisiana. ROA.462. Officers in Lockport, Louisiana then located the car parked at an apartment complex in Lockport. ROA.462. Once an officer verified the tag number, he set up surveillance on the vehicle and notified his superiors. ROA.463-64. LaFourche Parish, Louisiana Sheriff Deputies responded to the apartment complex and arrested Scott as he approached the vehicle. ROA.467. Roy was arrested a short time later. ROA.467. The deputies then obtained a search warrant for the Pontiac G6. ROA.467-68.

- 6 -

One document seized from the car showed that Angel Roy was the owner of the vehicle. ROA. 473. Officers also found Roy's driver's license. ROA.479. Postal Inspectors learned of a car burglary that occurred the night before the post office robbery. The victim had left her car outside a gym and when she returned to it, she found the car window broken and her gym bag with clothing, purse, and costume jewelry stolen. ROA.489-95. Later that night at the Amory, Mississippi Walmart, Roy was caught on surveillance video wearing clothing taken from the victim's car. ROA.492-93; ROA.506; ROA.548; ROA.551.

Prior to trial the court denied the government's attempt to introduce testimony of another of Roy's prior boyfriends, Michael Brazzell, who would have testified that Roy had approached him several months earlier and asked him to help her rob the Randolph post office. He stated that he and Roy had driven to North Mississippi from South Alabama and cased the Randolph Post Office. Brazzell stated that Roy wanted to stay in the car while he committed the robbery of the post office. He further stated that Roy told him they would need to kill the Postmaster because the postmaster knew her. Doc. 58.

Scott pled guilty before Ms. Roy's trial. Her case was tried from October 23 through October 25, 2017. ROA.132. Scott testified that Roy planned the robbery and picked the target post office.

The jury convicted Roy on both counts. ROA.132. The U.S. Probation Service completed a Presentence Investigation Report (PSR). Doc. 941-63. The PSR applied a 4-level enhancement for causing serious bodily injury by shooting the Postmaster. ROA.947. Ms. Roy objected to the enhancement. ROA.934-36; ROA.756-57. After a hearing on the objection, the court overruled Roy's objection to the enhancement and sentenced her to a 270-month term of

incarceration, consisting of consecutive terms, 150 months for the robbery and 120 months for the discharge of the firearm during and in furtherance of the robbery. ROA.759; ROA.164-70.

Both Roy and her counsel filed notices of appeal. ROA.171-72; ROA.175; ROA.187-88. The Fifth Circuit Court of Appeals affirmed her convictions and sentence. *United States v. Roy*, 765 Fed. App'x. 85 (5th Cir. 2019). The U.S. Supreme Court declined to review the case. 140 S. Ct. 525 (2019).

Ms. Roy filed a motion for compassionate release because of the COVID-19 coronavirus pandemic. Doc. 136. The court denied the motion. Doc. 142. She then filed the instant § 2255 motion to vacate, set aside, or correct her sentence, Doc. 138, presenting the following claims for relief:

(1) Ineffective assistance of counsel:

    (a) Failure to call witness Jeremy Smith;

    (b) Advising Ms. Roy not to testify;

    (c) Failure to investigate the case;

    (d) Failure to seek a change of venue;

    (e) Failure to object to witness statements regarding prior bad acts;

    (f) Failure to impeach witness Whitney Lashay Owens;

    (g) Failure to object to prosecution's statements during closing arguments.

(2) Whether Roy's conviction for aiding and abetting the intentional assault of a U.S. Postmaster under 18 U.S.C. §§ 2114(a) and 2 is not a crime of violence under 18 U.S.C. § 924(c)(3)(A).

The court will discuss each ground for relief in turn.

## Ineffective Assistance of Counsel

The court must address claims of ineffective assistance of counsel under the two-prong test set

forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient and that the deficiency resulted in prejudice to her defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011).

### Ground One (a): Failure to Call Witness Jeremy Smith

The decision whether to call witnesses is strategic in nature; as such, complaints of uncalled witness are "disfavored" as a basis for proving that counsel provided ineffective assistance. *United States v. Harris*, 408 F.3d 186, 190 (5th Cir. 2005). (citing *Buckley v. Collins*, 904 F.2d 263, 266 (5th Cir.1990) and *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984)). Ms. Roy argues that counsel was deficient for not having Jeremy Smith testify that codefendant Richard Scott admitted to committing a crime – but not to tell her about it. Roy's counsel

thoroughly cross-examined Scott, who admitted that he shot at the postmaster – intending to kill

her – and that he had no remorse for his actions. Counsel also presented testimony of another

inmate who stated that Scott told him that Roy was not involved in the robbery and shooting.

Counsel also brought out that Scott had written Roy letters in jail stating that he was not going to

implicate her in the robbery and shooting. ROA.510.

      As to Jeremy Smith, Roy's counsel provided his thoughts regarding Smith's potential

testimony and why he did not introduce it:

> First: Jeremy Smith did not tell the investigator what crime Scott said that he
> committed. Only that he had committed a crime, or "done a bad thing," or words to
> that effect. That crime could be one of a great number that Scott committed in the
> days surrounding the shooting. Another interpretation of this comment could have
> been "don't tell Angie that I told you." Which could mean that Ms. Roy knew the
> shooting had been committed, but did not want Scott to tell anyone that they had
> committed the crime at all. Presumably, no one would want their accomplice in an
> armed robbery/aggravated assault to go around telling friends about it.
>
> Second: Smith's account of the events did not have Scott and Ms. Roy being apart for
> long enough for Scott to have dropped Ms. Roy off at Smith's residence, drive to
> Randolph, shoot the postmaster, and drive back to Smith's residence. His testimony
> about the timeline of Scott and Ms. Roy's activities would have been in direct conflict
> with that of Roy's daughter, and would have bolstered the testimony of Owens.
>
> Third: Scott sent Ms. Roy numerous letters saying that she was innocent, and other
> things to that effect. I had those letters, and introduced them into evidence. I did not
> want to use Smith when I knew his time line would not match Ms. Roy's daughter's
> timeline when I had Scott's own letters. These letters were, in my opinion much more
> credible than any evidence which might have been elicited from Smith, and the letters
> ran no risk of discrediting Ms. Roy's daughter.

Affidavit of Robert W. Davis, trial counsel for Angela Roy, attached as Exhibit 1 to the

government's response to the instant motion to vacate, set aside, or correct sentence.

      Defense counsel thus determined that the potential damage from Smith's testimony

outweighed any benefit, and the evidence Roy sought to put before the jury was introduced

through the testimony of other witnesses or through documents. Counsel's reasoning is sound,

and the court will give his decision proper deference. Counsel offered effective assistance in declining to call Jeremy Smith as a witness, and his strategic decision did not harm Ms. Roy's defense. This ground for relief will be denied.

### Ground One (b): Advising the Defendant Not to Testify

Ms. Roy alleges she wished to testify on her own behalf, but her attorney advised against it because her prior criminal history would be admissible impeachment information – causing the jury to view her in a bad light. Roy rested her case, and there was no colloquy regarding her desire to testify or not testify.

A criminal defendant has the right to testify, and only she can waive this right – not counsel. *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002). That waiver must be knowing and voluntary. *Id.*; *Harris*, at 191–92. Even without a colloquy regarding a defendant's decision not to testify, a district court may determine voluntariness, discount a defendant's contrary claim – and determine whether that decision impacted the case:

> *In the absence of evidence in the state court record of the defendant's wish to testify*, we think it appropriate for the *habeas* court to presume that the defendant acquiesced in his counsel's advice or otherwise made a voluntary choice not to testify.

*Jordan v. Hargett*, 34 F.3d 310, 315 (5th Cir. 1994), *on reh'g en banc,* 53 F.3d 94 (5th Cir. 1995) (emphasis added). Thus, the silence of a petitioner on the issue can show her acquiescence in counsel's advice not to testify.

The Fifth Circuit has applied that standard to different facts and found that counsel's performance was deficient. *See United States v. Mullins*, 315 F.3d 449, 455 (5th Cir. 2002). The facts in *Mullins* are, however, distinct from those in the present case, as counsel in *Mullins* testified that her client had, indeed, told her that he wished to testify, but she did not call him as a witness:

- 11 -

> Mullins testified at the *habeas* hearing that he knew that he had a constitutional right to testify. Nothing in the record indicates that he made his desire to testify known to anyone but his lawyer. If our record here had no more we could conclude that Mullins had accepted the advice of counsel. There was more. Mullins's trial counsel testified that she did not leave the decision to Mullins. She explained that while he had initially agreed with her advice, he changed his mind during the trial. The district court found that both Mullins and his trial counsel "testified credibly at the evidentiary hearing that he expressed a desire to testify [to his counsel] numerous times during trial and that counsel alone chose to prevent his testimony." We are compelled to conclude that this finding is not clearly erroneous. That is, the record is not silent on the outcome of the discussion between lawyer and client. In this circumstance we cannot infer from Mullins's silence before the trial court that he acquiesced in the advice not to testify.

*Mullins*, 315 F.3d at 455. However, in the present case, Ms. Roy's trial counsel disputes her allegation that she wished to testify:

> Roy's assertion here is patently false. I asked her if she wanted to testify. She said that she did not. While I cannot recall her exact words, she was extremely happy with the way trial had gone. She indicated that I had told the jury everything they needed to know, and that she did not need or want to testify.

Exh. 1, Affidavit of trial counsel Robert W. Davis. The court concludes that Roy's silence regarding her decision whether to testify is evidence that she followed counsel's advice. As such, the court finds that counsel's performance was constitutionally adequate.

A defendant who argues that her attorney prevented her from testifying must satisfy both prongs of *Strickland* – deficient performance and prejudice resulting from that deficiency. *Mullins*, 315 F.3d at 452; *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). Ms. Roy cannot show that the absence of her testimony prejudiced her defense. Counsel ably presented her defense, and his assertion that Roy believed he "had told the jury everything they needed to know" about her defense is clear in the trial record. Counsel presented her defenses and supporting evidence – and clearly explained them during his closing argument. In short, counsel presented the defenses Roy wanted.

Even if Roy did wish to testify, she suffered no prejudice, as counsel skillfully presented her defenses—alibi and placing blame on others—to the jury. In addition, as Roy's attorney told her that,

- 12 -

if she took the stand, she would be subject to cross-examination by the government. That would have opened the door for the government to explore her other crimes. Indeed, her testimony could well have enabled the government to call rebuttal witnesses, with the potential to further undermine her defense. The failure to testify, even if she so desired, did not satisfy the second prong of *Strickland*—she suffered no prejudice. This ground for relief is without substantive merit.

### Ground One(c) – Failure to Investigate the Case

Roy argues that her counsel rendered ineffective assistance by not implicating a boyfriend—Michael Brazzell—as the perpetrator. The *government* sought to introduce Brazzell's testimony regarding Roy's efforts to recruit him to commit the armed robbery, and the testimony would have included his description of her taking him to Randolph to scout the post office – and that he declined to participate. Doc. 58. The court excluded the proposed testimony as substantially more prejudicial than probative under Fed. R. Ev. 403 and as impermissible evidence of other crimes or wrongful acts under Fed. R. Ev. 404(b). Doc. 64. It is unclear whether Brazzell would have testified as Roy believes. Nonetheless, the government certainly could have used that testimony to establish Roy's identity – and to show that she formulated the plan to rob the Randolph Post Office – both of which would have supported the prosecution's case against her.

Roy argues that counsel should have called Brazzell to show that he held a grudge against her and thus planned and carried out the armed robbery to frame her. Trial counsel has shed light on his strategy not to call Brazzell as a witness:

> First: If Michael Brazzell were to have admitted that he said he would send her *back* to prison, the jury would thereby be informed that she had been in prison to begin with. I thought it best to minimize the jury's knowledge of her criminal record to the extent possible.

- 13 -

Second: Ms. Roy was on parole at the time she was arrested. Sending her back to prison could involve reporting her to her parole officer for the numerous crimes she was committing on a day-to-day basis. If I put Brazzell on the witness stand and asked him to admit that he threatened to send her back to prison, he could simply say, "Yes I did. For breaking into cars, or any of the numerous crimes she was committing all over Florida, Mississippi, and Alabama." As stated above, I thought it best to minimize the jury's knowledge of her criminal record to the extent possible.

Third: Ms. Roy's theory was that Brazzell had shot the postmaster in order to frame her for it. This fell apart the instant her co-defendant confessed, and implicated her.

Exh. 1, Affidavit of trial counsel Robert W. Davis.

Trial counsel recognized that Brazzell's testimony would have further implicated Roy as the architect of the armed robbery. It would also have verified her identity – and revealed the plan she had formulated. Brazzell's testimony would also have shown that Roy had been imprisoned before the armed robbery. Further, as counsel noted, Roy's proposed defense (that Brazzell had planned and carried out the robbery to frame her) was destroyed when codefendant Scott pled guilty and testified that he had carried out the armed robbery and shooting. It is clear that Roy's trial counsel *did* investigate Brazzell and – for multiple valid reasons – decided that trying to implicate him would severely damage her defense. Indeed, counsel argued that the jury should *not* hear Brazzell's testimony. Doc. 66. Counsel neither rendered ineffective assistance on this ground, nor adopted a strategy that harmed Roy's defense.

Roy also complains that her counsel did not seek to exclude a copy of her 2003 driver's license and that her 2016 driver's license should have been used, instead. First, her allegation is contradicted in the record, as the license taken from the Pontiac G6 was introduced without objection, and the witness identified it as having been issued on August 26, 2016. ROA, 449-450. Second, even if her allegation were accurate, the court cannot discern how the date her driver's license was issued would have had any impact on her defense. The admission of the

driver's license served only to associate her with the vehicle, which, in any event, was seen by the postmaster – and which was also present at her arrest. This ground for relief is without substantive merit.

**Ground One(d) – Failure to Seek a Change in Venue**

Angela Roy alleges that trial counsel was ineffective for failing to mitigate the effects of pretrial publicity. It is unclear what her claim of ineffectiveness might be. Her only allegation was that the publicity "would make it nearly impossible to get an impartial jury." Doc. 138, p. 7. Roy's trial counsel explained his decision:

> Ms. Roy seems to imply that I should have moved for a change of venue. I had no basis upon which to move for a change of venue. The venire panel was subject to a very thorough voir dire. As I recall, though I have not read the transcript, none of the eventual jury members had even heard of the shooting. All said that they could be fair and impartial.

Exh. 1, Affidavit of trial counsel Robert W. Davis.

Counsel's memory is accurate. During voir dire five potential jurors acknowledged some knowledge of the events or about Randolph, Mississippi. The majority were excused for cause with no objection from either side. One juror was left on the panel because he indicated he could be fair – and was connected to the case solely by virtue of living within five miles of the post office. ROA.786-792. There was no reason for Roy's counsel to try to further reduce the impact of pretrial publicity – or to seek a change of venue. Voir dire identified the potential jurors that had any familiarity with case, parties, or witnesses. "[T]he government may demonstrate from the voir dire that an impartial jury was actually impaneled in appellant's case.... If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity." *United States v. Harrelson*, 754 F.2d 1153, 1159 (5th Cir. 1985). There was no proof of excessive pretrial publicity, and the voir dire reveals that the publicity

- 15 -

impacted neither the jury selection nor the trial. The jury carefully considered the case and rendered its verdict. Angela Roy has not identified that pretrial publicity adversely impacted her case. She has shown neither improper acts by her attorney nor harm to her defense. This claim is without substantive merit.

### Ground One (e) – Failure to Object to Witness' Statements

Angela Roy claims that her trial counsel was ineffective for failing to object to statements or questions of witnesses that revealed her prior bad acts. She states that this happened "several times" and cites "trial transcripts page 177, 9-23, page 263, 23-25, and page 264, 1." Doc. 138, p. 11. These citations do not, however, align with the trial transcripts in the record of the case. One witness stated that she met Roy either after her or her father's release from jail. ROA.482. Counsel immediately objected to the testimony, and the court gave a cautionary instruction to the jury to disregard the answer. ROA.486.

This issue was raised and argued by Roy's counsel at trial and on appeal. The Fifth Circuit found: "The brief and unsolicited witness statement was withdrawn from the jury with a prompt direction by the district court that it be disregarded, and the remark was not so highly prejudicial as to be incurable by the district court's admonition." *Roy*, 765 F. App'x at 86. Roy does not suggest how an objection and request for a cautionary instruction were ineffective. The Fifth Circuit and the court properly found that the statement did not merit a mistrial, and counsel's actions did not prejudice Roy's case. In addition, as the Fifth Circuit has already ruled on this issue on direct appeal, this court is procedurally barred from considering it on collateral review. *See United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986). Thus, this ground for relief is both procedurally barred and without substantive merit.

### Ground One(f) – Failure to Impeach a Witness

- 16 -

Roy argues that witness Whitney Lashay Owens should have been impeached because she changed her account of Roy's presence at her residence at the time of the postal robbery and shooting. She alleges that her "lawyer did not once offer the private investigator's report to show Mrs. Owens was a saying a whole different story" at trial. Doc. 138, p. 12.

As set forth above, Owens testified, and counsel skillfully cross-examined her. She refuted Roy's alibi – and acknowledged her prior convictions and drug use. ROA. 321-345. As to this argument, Roy's trial counsel noted:

> First: Ms. Roy consistently wanted me to portray her to the jury as a thief rather than an armed robber. She wanted me to elicit testimony from Owens that while Roy was well known to steal and break in cars, she was not generally violent. I made the strategy decision to try to keep as much of Ms. Roy's criminal activity from the jury as possible. I don't believe that the jury would have made the fine distinction between auto burglary and armed robbery. I believed that this testimony would have hurt Ms. Roy badly.
>
> Second: Owens's testimony was consistent where it mattered. She laid out a timeline that contradicted the timeline from Roy's daughter. That portion of her testimony was (substantially) the same statement she gave the investigator. I didn't want to take the chance of bolstering her important testimony by impeaching her unimportant testimony.

Affidavit of trial counsel Robert W. Davis. Counsel did not err by declining to attack her story; instead, the decision was strategic.

Examination and cross-examination of witnesses is, by its very nature, strategic. Counsel's explanations reveal the dueling considerations in addressing a witness who may appear friendly to a defendant – but nonetheless has knowledge of damaging evidence. Owen was just such a witness. She provided important evidence about the gun, the time frame, and the absence of Roy and Scott during the robbery. ROA. 321-345. Roy's counsel attacked her credibility when he could – but could not attack her on other grounds because she had provided his investigator the same information. The decision to probe her in some ways, but not others, is

- 17 -

a standard trial strategy which can rarely support a claim of ineffective assistance of counsel.

*See Strickland, supra.*

### Ground One(g) – Failure to Object to Closing Argument

Roy argues that counsel was ineffective for deciding not to contemporaneously object to

a portion of the government's closing argument that showed Roy and Scott decided to flee, rather

than go to the police, when they heard federal authorities were searching for them:

> You heard testimony that Ms. Roy saw her dad's truck at the police station down in Mobile—or Wilmer, and you heard that they'd already learned that the feds were looking for them. And you heard that when she saw her dad's truck at the police station, they rushed back to the campsite, packed up, and headed for Texas.
>
> Well, why? If she didn't do it, if she was at home asleep with her daughter, why would she be afraid of her father being at the police station? Why wouldn't she go to the police station and say, "If you're looking for me, here I am. I was asleep in Mobile. I don't know anything about this"? Why would you run? Why would you leave for Texas because your dad's truck is at the police station? Why would you not say at that point to Mr. Scott, "I don't know what you've done, but you're on your own. I'm out of here"?

Doc. 130 at 61-62. ROA at 505-506. Her counsel explained why he did not object at the time,

but waited until after closing arguments had ended:

> Ms. Roy is correct about this. I should have objected during counsel's closing argument. I did not during closing because, in my opinion, interposing an objection during closing or opening can be interpreted by the jury as rudeness on the part of the lawyer. Much like interrupting in the middle of someone's sentence during a conversation. *When the comment was made that implicated her right to remain silent,* I chose to wait rather than to risk alienating the jury. Also, I didn't believe that the Court would declare a mistrial. I thought at most the Court would issue a cautioning instruction. Such an instruction would have only called attention to the thing I didn't want the jury to hear in the first place. I admit that was probably an error on my part.

Exh. 1, Affidavit of trial counsel Robert W. Davis (emphasis added).

Though counsel admitted the possibility of error, the court does not see the argument as

erroneous, and an objection would have been futile. The Government was arguing that flight may be

- 18 -

used as evidence of a defendant's guilt – which is proper argument. *See United States v. Martinez*, 190 F.3d 673, 678 (5th Cir. 1999) ("Evidence of an accused's flight is generally admissible as tending to establish guilt.")

When trial counsel objected (after closing arguments), the court noted, "I'm not sure it's an error, but I think the opportunity to correct it has passed." ROA, 745. Indeed, Roy raised this argument in the Fifth Circuit on direct appeal, and the court held:

> [D]espite Roy's contention to the contrary, the prosecutor's argument regarding Roy's pre-arrest decision to flee rather than to contact the police and clear her name did not constitute a reference to her decision not to testify at trial.

*Roy*, 765 F. App'x at 86. Thus, as the Fifth Circuit has already ruled on the issue, this court is procedurally barred from considering it on collateral review. *See United States v. Kalish, supra*.

### Ground Two:  Whether Roy's conviction for aiding and abetting the intentional assault of a U.S. Postmaster under 18 U.S.C. §§ 2114(a) and 2 is a crime of violence under 18 U.S.C. § 924(c)(3)(A).

In her motion [164] to amend Angela Roy requests that the court find that her conviction for aiding and abetting the assault of a U.S. Postmaster under 18 U.S.C. §§ 2114(a) and 2 is not a crime of violence under 18 U.S.C. § 924(c)(3)(A).[2]  To clarify this issue, the court must first discuss the nature of a conviction for aiding and abetting.  Then the court will discuss whether Roy's conviction for assaulting the Postmaster with the intent to rob her by use of a deadly weapon constitutes a crime of violence under 18 U.S.C. § 924(c)(3)(A) – and how her conviction for aiding and abetting affects that determination.

---

[2] Section 2114(a) defines assault on a postal employee, while § 2 defines aiding and abetting.

### The Nature of Aiding and Abetting Under 18 U.S.C. § 2

Unlike conspiracy and attempt, aiding and abetting is neither a separate crime – nor an inchoate offense. Instead, one can only be found guilty of aiding and abetting if one participates in the underlying crime. *United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015). To prove aiding and abetting, the Government must show that (1) the underlying offense was committed by some person, and the defendant: (2) associated with the criminal venture; (3) purposefully participated in the criminal venture; and (4) sought by action to make that venture successful. See, Instruction 2.04—Aiding and Abetting (Agency) 18 U.S.C. § 2 (Fifth Circuit Pattern Jury Instructions: Criminal 2019). Put another way:

> To aid and abet a crime, a defendant must not just "in some sort associate himself with the venture," but also "participate in it as in something that he wishes to bring about" and "seek by his action to make it succeed."

*Rosemond v. United States*, 572 U.S. 65, 76–77 (2014) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) which, in turn, quotes *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (J. Learned Hand)).

The nature of aiding and abetting becomes clear upon reviewing the statutory language. The statute describes only the manner the defendant participated in the crime – and her level of culpability:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, *is punishable as a principal.*

> (b) Whoever willfully causes an act to be done which if directly performed by [her] or another would be an offense against the United States, *is punishable as a principal.*

18 U.S.C.A. § 2 (emphasis added). By its plain language, Section 2 does *not* carry a separate sentence; it merely requires those who aid and abet in the underlying offense to face the same sentence as the principal.

- 20 -

A review of Roy's criminal judgment leads to the same conclusion. Roy was convicted and sentenced for two offenses, as reflected in her criminal judgment:

> (Count 1): Assault of a postal employee with intent to commit robbery and aiding and abetting under 18 U.S.C. § 2114(a) and 2; and
>
> (Count 2): Discharging a firearm during and in relation to a crime of violence.

Doc. 112. Her sentence of 270 months comprises 150 months for Count 1 (which includes the underlying offense and the aiding and abetting charge), and 120 months for Count 2 (the firearm offense). Aiding and abetting under § 2 and the underlying offense under § 2114(a) operated as a single offense – resulting in a single term of incarceration – 150 months. The aiding and abetting conviction merely reflected the manner of Roy's participation, as well as her level of culpability regarding the underlying offense ("punishable as principal") – and did not carry its own sentence.

Roy was convicted for assault of a postal employee with intent to commit robbery by use of a deadly weapon (the underlying offense) – by aiding and abetting her co-defendant. Thus, under § 2 (the aiding and abetting statute) she was "punishable as a principal" for the underlying crime. The jury found that a person committed an assault on a postal employee using a deadly weapon with the intent to commit robbery – and Angela Roy, by aiding and abetting, "participate[d] in it as in something that [s]he wishe[d] to bring about" and "sought" by [her] action to make it succeed." *See Rosemond, supra*. Under § 2, she just as culpable as her co-defendant and "punishable as a principal."

**Assault of a Postal Employee Under 18 U.S.C. § 2114(a)**
**Is a Crime of Violence Under 18 U.S.C. § 924(c)(3)(A)**

To commit the offense of assault on a postal employee under § 2214(a), a defendant must assault a person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property when done by putting the life of the person in jeopardy by the use of a

dangerous weapon.  18 U.S.C. § 2114(a).  The Sixth Circuit has applied the categorical approach to

assault of a postal employee under § 2114 and found it to be a crime of violence under the elements

clause, § 924(c)(3)(A).  *Knight v. United States*, 936 F.3d 495, 500 (6th Cir. 2019) (citing *Stokeling v.*

*United States*, 139 S. Ct. 544, 550 (2019) (internal citations omitted)).  The crux of the Sixth Circuit's

holding was that "[t]he common-law crime of robbery has 'long required force or violence,' " and the

offense – § 2114(a) – requires "that the defendant use a dangerous weapon to put the victim's life in

jeopardy."  *Id.*  The Fifth Circuit, in dicta, has likewise found the offense to be a crime of

violence.  *See United States v. Castro*, 30 F.4th 240, 248 (5th Cir. 2022) (which recognizing in

dicta that a § 2114(a) offense "satisfies the [18 U.S.C. § 924(c)'s] elements clause" – listing

cases from 4 other Circuit Courts of Appeal reaching the same conclusion).[3]  This court agrees; §

2114(a) is a "crime of violence" under § 924(c)(3)(A) of the ACCA.

Section  2114(a) is a "crime of violence," and a conviction for aiding and abetting merely

reflects the manner of participation and culpability for that underlying crime.  As such, Roy

participated in the crime of violence and faced the same punishment as her co-defendant.  She

was properly sentenced under § 924(c)(3)(A) of the ACCA.  This ground for relief is without

substantive merit.

### Conclusion

In sum, none of the Movant's grounds for relief has merit.  In addition, Grounds One(e) and

One(g) are procedurally barred, as the Fifth Circuit Court of Appeals has already decided those issues

---

[3] Those four cases are:  *In re Watt*, 829 F.3d 1287, 1290 (11th Cir. 2016); *United States v.*
*Enoch*, 865 F.3d 575, 582 (7th Cir. 2017); *Knight v. United States*, 936 F.3d 495, 501 (6th Cir.
2019); and *Williams v. United States*, 794 F. App'x 612, 614 (9th Cir. 2019) (mem.)

on direct appeal.  The Movant's motion [164] to amend her petition will be granted.  The instant motion to vacate, set aside, or correct sentence will be denied.  A final judgment consistent with this memorandum opinion will issue today.

      **SO ORDERED**, this, the 21st day of August, 2023.

                        /s/ Michael P. Mills
                        UNITED STATES DISTRICT JUDGE
                        NORTHERN DISTRICT OF MISSISSIPPI